UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————X

GENERAL ELECTRIC CAPITAL
CORPORATION,                                        Case No. 07 CIV 9715 (RJH)

                    Plaintiff,

        -against-

NEW YORK MEG, L.L.C., 4-D
NEUROIMAGING, INC. and MARTIN EGLI,

                    Defendants.

————————————————————————X


**DEFENDANT NEW YORK MEG, L.L.C.'s
MEMORANDUM OF LAW IN
<u>RESPONSE TO ORDER TO SHOW CAUSE</u>**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**..................................................................................1

**STATEMENT OF FACTS**.......................................................................................4

    *Financing Agreement*........................................................................................4

    *Performance Under the Financing Agreements*.........................................................6

**ARGUMENT**......................................................................................................8

I.      PLAINTIFF HAS FAILED TO MEET ITS BURDEN
         OF SHOWING THE EMERGENCY RELIEF IS
         "COMMERCIALLY REASONABLE"................................................................8

    *Objective Behind GECC's Commercially Unreasonable Request*........................11

II.     EVEN IF GECC IS ENTITLED TO THE SYSTEM,
         NY MEG IS NOT CONTRACTUALLY OBLIGATED
         PHYSICALLY DELIVER IT TO GECC................................................................13

III.    THE EXPIRATION OF THE LC PRIOR TO
         AUGUST 31, 2007 DID NOT CONSTITUTE A BREACH
         THE MASTER SECURITY AGREEMENT AND NY MEG
         DID NOT COMMIT FRAUD IN RELATION TO THE LC..............................15

    *GECC Cannot Claim Breach of the Master Security Agreement*
    *Based on the LC's July 31, 2007 Expiration Date* ................................................15

    *There Was No Fraud*..........................................................................................18

VI.    GECC CANNOT RECOVER ITS ATTORNEYS FEES AND COSTS.............19

**CONCLUSION**.................................................................................................19

## TABLE OF AUTHORITIES

**Cases:**                                                                    *Page(s)*

*Allen v. Meyer,*
  73 NY 1 (1878)...................................................................................16

*Alyeska Pipeline Service Co. v. Wilderness Society,*
  421 U.S. 240, 95 S.Ct. 1612 (1975)........................................................19

*Arcambel v. Wiseman,*
  3 U.S. 306, 1 L.Ed. 613 (1796)...............................................................19

*Auto Style Leasing Ltd. v. Evans,*
  1995 WL 144812 (S.D.N.Y. 1995)..........................................................18

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health*
  121 S.Ct. 1835 (2001).............................................................................19

*Central Budget Corp. v. Garrett,*
  48 A.D.2d 825, 368 N.Y.S.2d 268 (2d Dep't 1975).....................................8

*Century Pacific, Inc. v. Hilton Hotels Corp.,*
  2007 WL 3036172 (S.D.N.Y. 2007).........................................................18

*Clark Oil Trading Co. v. Amerada Hess Trading Co., A Div. of Amerada Hess Corp.,*
  1993 WL 300039 (S.D.N.Y. 1993)..........................................................16

*Creditleasing Inter. Corp. v. OMLW Inv. Co.,*
  1990 WL 83520 (S.D.N.Y. 1990).......................................................9, 10

*Evcco Leasing Corp. v. Ace Trucking Co.,*
  828 F.2d 188 (3rd Cir. 1987)...................................................................17

*General Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.,*
  623 N.Y.S.2d 821 (N.Y. Sup. Ct. 1995)...................................................17

*Hadden v. Consolidated Edison Co.,*
  45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, (1978).........................................17

*Hallinan v. Republic Bank & Trust Co.,*
  2007 WL 2572092 (S.D.N.Y. 2007).........................................................19

*Iannarelli v. Carvel Stores of N.Y., Inc.,*
    187 N.Y.S.2d 628 (N.Y. Sup. Ct. 1959)...................................................................18

*Levinson v. Primedia Inc.,*
    2007 WL 2298406 (S.D.N.Y. 2007)...........................................................................14

*Midwest Maintenance & Constr. Co. v. Vela,*
    621 F.2d 1046, 1048 (10th Cir. 1980)..........................................................................17

*Minnesota Min. & Mfg. Co. v. Kirkevold,*
    87 F.R.D. 324, 335 (D. Minn. 1980)...........................................................................17

*In re Sackman Mortg. Corp.,*
    158 B.R. 926 (Bankr. S.D.N.Y. 1993)...................................................................8, 10

*SNCB Corporate Finance Ltd. v. Schuster,*
    877 F.Supp. 820 (S.D.N.Y. 1994) ..............................................................................8

**Statutes:**

*N.Y.U.C.C.* § 9-504(3) (McKinney 1994)...............................................................................8

## PRELIMINARY STATEMENT

General Electric Capital Corporation's ("GECC") request for an order requiring New York MEG, L.L.C ("NY MEG") to immediately dismantle and ship a highly sensitive brain imaging system to GECC should be denied because it is unreasonable and inconsistent with New York's secured transactions law. Moreover, such an order is unnecessary to protect GECC's interests in the collateral at issue.

GECC's requested relief is unreasonable and unlawful because it fails to meet the Uniform Commercial Code's standard governing creditors' disposition of collateral. Under this standard, creditors have the burden of proving that *every aspect* of a disposition of collateral, including the method, manner, time, place, and other terms, can be deemed "commercially reasonable."[1] In this case, GECC's request for an order requiring the immediate dismantling and shipping of the intricate brain imaging system fails the "commercially reasonable" standard because such an act would destroy its underlying value.

The collateral at issue here is NY MEG's advanced Neuro Imaging Brain Mapping System (the "System") which uses super-conducting detectors and amplifiers to allow for measurements of the magnetic fields generated by neuronal activity of the brain. The System relies on a composite of delicate sensors, magnetometers (used to measure small magnetic fields), computers, complex electrical equipment and precision circuitry. Due to its complexity, the System requires specialized maintenance and monitoring by NY MEG medical professionals and technicians that are expertly trained in neuroimaging equipment and this System in particular.[2] An order requiring the System be dismantled for shipment to GECC - a finance

---

[1] N.Y. U.C.C. LAW § 9-610(3) (2001).
[2] *See* Paragraph 20 of the Affidavit of John Hakes, sworn to on January 4, 2008 (hereinafter "Hakes Aff.")

company - would physically and irreparably impair the System's functionality rendering what is currently a multi-million dollar piece of equipment practically valueless.[3]  Therefore, the proposed order should be denied on the grounds it fails to meet New York law requiring "commercial reasonableness."

Additionally, the order is unnecessary to protect GECC's interest in the collateral. As discussed more fully below, the System has been, is and will continue to be maintained by NY MEG in its ongoing business.[4]  Further, GECC has continued to receive the $55,000 monthly installment payments from NY MEG on the loan secured by the System.[5]

GECC is pressing for the order – despite the resulting economic destruction of each party's interest in the collateral – in order to gain collateral it is not contractually entitled to: the renewal of a Letter of Credit it had previously allowed to expire through its own carelessness or for some reason GECC now regrets.

GECC has omitted its true objectives from its moving papers.  Instead, GECC disingenuously argues that it needs "emergency" relief -- in the form of the immediate dismantling and delivery of the System -- to protect the value of the collateral.  However, this argument is baseless.  The purported "emergency" is based on the allegation that NY MEG is "not capable nor incentivized" to maintain the System.  This allegation is false.

NY MEG professionals have been given specialized training by defendant 4-D Neuroimaging, Inc. ("4-D"), the manufacturer of the System, in the maintenance of its integrated components.[6]  Additionally, NY MEG receives engineering support from 4-D to ensure the

_____

[3] *See* Hakes Aff., ¶ 23.
[4] *See* Hakes Aff., ¶ 24.
[5] *See* Hakes Aff., ¶ 17.
[6] *See* Hakes Aff., ¶ 25.

System's continued maintenance.[7]  Therefore, NY MEG is not only "capable" of maintaining the System; it is uniquely qualified to do so.

Further, GECC's allegation that NY MEG lacks the incentive to maintain the System is equally baseless.  The System is integral to NY MEG's continuing business operations.[8]  Its maintenance is directly linked to the success of the business, as well as NY MEG's ability to provide medical data to patient's physicians.[9]  The facts of this case bear this out.  NY MEG continues to pay technicians to maintain the system.[10]  Doctors continue to use it to treat patients.[11]  And NY MEG continued to make installment payments to GECC for the loan secured by the System.[12]  NY MEG's past and ongoing conduct attest to its incentive in maintaining the System.

In step with the disingenuous allegations discussed above, GECC's substantive claims are also deficient.  For example, GECC is deliberately overreaching its contractual rights by requesting an order requiring NY MEG to physically *deliver* the collateral to GECC.  The unambiguous language of the loan agreement requires no such delivery.  Additionally, GECC's breach of contract claim relating to the letter of credit that expired July 2007, and its facially deficient and conclusory fraud claim are without merit.  Finally, GECC's alter ego claims have no basis in law and are indicative of the GECC's desperation.

In sum, GECC's requested order is unnecessary, unreasonable, and not consistent with New York secured transactions law.  The order should be denied.

--------

[7] *See* Hakes Aff., ¶ 20.
[8] *See* Hakes Aff., ¶ 26.
[9] *See* Hakes Aff., ¶ 26.
[10] *See* Hakes Aff., ¶ 26.
[11] *See* Hakes Aff., ¶ 26.
[12] *See* Hakes Aff., ¶ 17.

## STATEMENT OF FACTS

Pursuant to various agreements GECC agreed to finance NY MEG's purchase of a highly complex Neuro Imaging Brain Mapping System (the "System") manufactured by 4D Neuroimaging, Inc. ("4D").

**Financing Agreements**

On or about May 9, 2003 GECC and NY MEG entered into a Master Security Agreement under which GECC financed NY MEG's purchase of the System.[13] The GECC's financing is secured against the System. NY MEG also executed and delivered to GECC a Promissory Note for $775,000 (which was amended on October 27, 2005 and August 25, 2006).[14] NY MEG entered into a separate security agreement with GECC on or about May 14, 2003 which grants GECC a security interest in certain additional collateral.[15]

Pursuant to the Equipment Schedule incorporated into the Master Security Agreement and the Promissory Note NY MEG agreed to pay GECC for its financing of that purchase as follows: (1) 11 monthly installments of $40,000 beginning in August 25, 2006 under the Master Security Agreement and 11 consecutive monthly payments on the Promissory Note of $15,000, totaling $55,000 a month (the "Installment Payments") and (2) one payment of $1,762,782.30 on July 25, 2007 and one payment of $650, 004.28 under the Promissory Note also on July 25, 2007, totaling $2,412,786.58 (collectively the "Balloon Payment").

Notably, the original arrangement between the parties did not call for a Balloon Payment under the Master Security Agreement. Pursuant to the first iteration of the Equipment

_____

[13] See Exhibit A of the Affidavit of Michael J. Tiffany, sworn to on January 4, 2008 (hereinafter "Tiffany Aff.")
[14] See Tiffany Aff., Ex. B.
[15] *See* Tiffany Aff., Ex. C.

Schedule, executed on May 9, 2003, simultaneously with the Master Security Agreement, NY

MEG was to pay down the financing entirely in monthly installments as follows: (1) 3 months of

installments in the amount of $0; (2) 12 months at $45,490.00; and then (3) 24 months at

$97,528.78.[16]  The Equipment Schedule was then amended on or about October 27, 2005 to

provide for installments and a balloon payment as follows: (1) 11 months at $43,784.45 and (2)

one payment at $1,842,808.48.  Further, there was a second amendment to the Equipment

Schedule executed on or about August 25, 2006, which provided the current terms of payment

under the Master Security Agreement: (1) 11 months at $40,000 and (2) one payment of

$1,842,808.48.

Additionally, a Letter Of Credit ("LC") in the amount of $950,000 was issued in

GECC's favor pursuant to a Second Amendment to the Master Security Agreement.[17]  The LC

was first posted on June 13, 2006.  It was renewed on October 30, 2006, also for $950,000.  This

renewal of the LC plainly stated, on its face, that it would expire on July 31, 2007 – "The validity

date is extended until July 31, 2007.  This new date is the final maturity.  That means not further

renewal of the stand-by letter of credit will be made after that date."[18]  A copy of this LC was

forwarded to GECC on or about October 30, 2006.[19]

---

[16] *See* Tiffany Aff., Ex. D, ¶ 2(c).
[17] *See* Tiffany Aff., Ex. E.
[18] *See* Tiffany Aff., Ex. E.
[19] *See* Hakes Aff., ¶ 11; Tiffany Aff., Ex. E.

**Performance Under the Financing Agreements**

Starting in 2003, both parties began to perform under the Master Security Agreement. GECC provided the financing and NY MEG purchased the System and issued the LC. NY MEG also paid the Installment Payments as they became due.[20]

In late 2005 and into 2006, GECC and NY MEG once again began negotiations regarding financing.[21] This resulted in GECC and NY MEG agreeing to additional financing in return for NY MEG's issuance of promissory notes in GECC's favor.[22]

Additionally, in 2006, GECC and NY MEG began exploring options in renegotiating the Master Security Agreement – including the deferral of the Balloon Payment due on July 25, 2007.[23] While negotiations were taking place, NY MEG continued to make the Installment Payments.[24] As discussed above, in October 2006, NY MEG renewed the LC in favor of GECC through July 31, 2007.[25] GECC was informed of, and made no objection to, the July 31, 2007 expiration date when the LC was renewed.[26]

GECC and NY MEG's business relationship continued into the summer of 2007. NY MEG continued to make the Installment Payments and the parties continued discussions on reworking the Master Security Agreement.[27] In July, 2007, based, in part, on the continued dialog with GECC regarding the reworking Master Security Agreement, NY MEG did not make the July 25, 2007 Balloon Payment.[28] Because of the course of conduct between the parties,

---

[20] See Hakes Aff., ¶ 12.
[21] See Hakes Aff., ¶ 13.
[22] See Hakes Aff., ¶ 13.
[23] See Hakes Aff., ¶ 13.
[24] See Hakes Aff., ¶ 14.
[25] See Hakes Aff., ¶ 11.
[26] See Hakes Aff., ¶ 11.
[27] See Hakes Aff., ¶ 14.
[28] See Hakes Aff., ¶ 15.

where they had already amended the terms of the Installment Payments and the Balloon Payment two times, NY MEG believed in good faith that a third amendment to those terms, including the Balloon Payment, could be reached between the parties.[29]

After NY MEG did not make the Balloon Payment, GECC did not attempt to force immediate repossession of the System or any other collateral.[30]  This was a logical step since NY MEG – not GECC – had the training and expertise to maintain the System and its value while the parties where negotiating new terms.  GECC allowed the LC to expire on July 31, 2007 and did not object to the July 31, 2007 expiration date in any way prior to its expiration.[31]

After the LC expired on July 31, 2007, GECC demanded that NY MEG cause the issuance of a new letter of credit.[32]  NY MEG did not post a new letter of credit and is not contractually obligated to do so.[33]

On October 12, 2007, GECC, filed an Order to Show Cause in New York State Supreme Court seeking, as "a matter of great urgency", the immediate possession of NY MEG's MEG equipment.  The case was then removed to the United States District Court for the Southern District of New York on November 2, 2007.

In an effort to negotiate a resolution to the dispute, the parties stipulated to a 45-day standstill for all Court proceeding on November 7, 2007; if no resolution could be reached, Defendants response papers were to be served by January 4, 2008.  The stipulation was "So

---

[29] *See* Hakes Aff., ¶ 15.
[30] *See* Hakes Aff., ¶ 16.
[31] *See* Hakes Aff., ¶ 11.
[32] *See* Hakes Aff., ¶ 17.
[33] *See* Hakes Aff., ¶ 17.

Ordered" by the Court on November 16, 2007.  The parties have not been able to resolve the dispute since the stipulation.

## ARGUMENT

### I.  PLAINTIFF HAS FAILED TO MEET ITS BURDEN OF SHOWING THE EMERGENCY RELIEF IS "COMMERCIALLY REASONABLE"

New York law requires that *"[e]very aspect* of a disposition of collateral, including the method, manner, time, place, and other terms, must be *commercially reasonable*." Section 9-610(3) (emphasis added); see also, *SNCB Corporate Finance Ltd. v. Schuster*, 877 F.Supp. 820 (S.D.N.Y. 1994) (citing N.Y.U.C.C. § 9-504(3) (McKinney 1994).  Courts have held that a "commercially reasonable" disposition makes a "good faith attempt to dispose of the collateral to the parties' mutual 'best advantage.' "[34] *Id.* (citing *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (2d Dep't 1975); *In re Sackman Mortg. Corp.*, 158 B.R. 926 (Bankr. S.D.N.Y. 1993).  And it is black letter law that the burden of establishing "commercial reasonableness" is firmly on the creditor. *SNCB Corporate Finance Ltd. v. Schuster*, 877 F.Supp. 820 (S.D.N.Y. 1994) (applying New York law holding secured lender bore burden of proof on whether it disposed of collateral in commercially reasonable manner.).

In this case, GECC fails the "commercially reasonable" standard because its proposed order requiring the System be dismantled and shipped to GECC would irreparably damage the System's sensitive components so as the render what is currently a multi-million dollar piece of equipment, practically valueless.  Additionally, the resale market for the System

---

[34] The term "commercially reasonable" is not specifically defined by the N.Y.U.C.C. and has been held to mean "that a qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties' mutual best advantage." Long Island Trust Co. v. Williams, 133 Misc.2d 746, 507 N.Y.S.2d 993, 997 (N.Y.Civ.Ct.1986) (citing Central Budget Corp. v. Garrett, 48 A.D.2d 825, 368 N.Y.S.2d 268 (2d Dep't.1975)), aff'd,142 Misc.2d 4, 539 N.Y.S.2d 612 (1988).

would be virtually non-existent because the costs involved in making it usable again would far outweigh any benefit to a resale customer.

The System is an advancement in technology made up of several highly sophisticated parts (sensors, magnetometers, computers, complex electrical equipment and precision circuitry). The value of the System derives not so much from the value of each of its components, but rather from the engineering and computer software that integrates each of the complex parts into a working system. If NY MEG was forced to disassemble the System (as it must be for shipment) and remove it from its current location (which itself is especially designed to house the System) its underlying value would be substantially destroyed because reintegration involves engineering costs that make reassembly economically impracticable.

For example, any potential resale customer would have to pay for engineers to reassemble the System and customize its parts to fit with the new customers' computers. In addition, special housing must be built to keep out naturally occurring magnetic fields. Further, the new owner would likely have to enter into separate contracts with Defendant 4-D to provide ongoing engineering support and pay for professionals to be trained in maintaining the System. As a result, the costs of reintegrating and re-engineering the System would far outweigh any benefit to a resale customer. Therefore, once the System is removed from NY MEG's specially designed location, it ceases to have resale value as imaging equipment and its component parts are virtually valueless.

Tellingly, GECC does not address the "commercial reasonableness" of its request. However, Courts do not allow creditors to simply ignore their burden, especially in cases involving summary judgment. For example, in *Creditleasing Intern. Corp. v. OMLW Inv. Co., Inc.*, 1990 WL 83520 (S.D.N.Y. 1990), plaintiff Creditleasing sued defendant for money owed

on a guarantee that was secured by the defendant's "cat scan" equipment. Creditleasing moved for summary judgment against defendant on the grounds that the guarantee was unconditional and therefore defendant was liable for outstanding money owed.

The court denied plaintiff's motion holding there was a genuine issue of material fact as to whether "the sale of the 'cat scan' equipment, which is the subject of this lawsuit, was commercially reasonable within the meaning of Section 9-504(3) [currently 9-610] of the UCC of the State of New York." The court held that "[a]lthough the plaintiff has filed an affidavit…supporting the reasonableness of the terms of sale, the defendant has filed an equally persuasive affidavit of Michael J. Schorr, who since 1975 has been in the business of buying, selling, leasing and operating cat scan units similar to the subject property, giving his opinion that the equipment in this case could have been sold for between $500,000 and $700,000 when it was actually sold for around $250,000." Therefore, the court held a material issue of fact existed as to commercial reasonableness and summary judgment as to the remainder of the money due on the guarantee was denied. *See also*, *In re Sackman Mortg. Corp.,* 158 B.R. 926 (Bankr. S.D.N.Y. 1993) ("Where factual issues exist as to the commercial reasonableness of any aspect of the sale, as indeed they do here, summary judgment must be denied.").

In this case, GECC has not had the opportunity to sell the System, but it seeks an order from this court that will begin the process of such a disposition. However, much like in *Creditleasing*, NY MEG has raised a material issues of fact as to the "commercial reasonableness" of GECC's conduct. In particular, the Affidavit of John M. Hakes establishes that: (1) the collateral is a unique and sensitive medical system which requires specialized maintenance and support to maintain its value, (2) NY MEG professionals have the specialized training and support to maintain the Systems value, (3) the proposed order would require NY MEG to dismantle and deliver the System to GECC which would irreparably impair the System

and deprive it of necessary maintenance resulting in the destruction of its underling value, and (4) if the System is removed, there would be no resale market in which to resell it because the costs associated with reintegration of its parts makes resale not economically feasible. In other words, the System is not like a Ford that plaintiff can simply tow and auction off. Rather, the value of the System as collateral is contingent upon continued expert handling and engineering support that NY MEG has, does and can provide.

Finally, the proposed order is unnecessary to protect GECC's interest the collateral. The System has been, is and will continue to be maintained by NY MEG in its ongoing business. Further, GECC has continued to receive $55,000 monthly installment payments from NY MEG on the loan secured by the System.

### Objective Behind GECC's Commercially Unreasonable Request

GECC is pressing for the order – despite the resulting economic destruction of each party's interest in the collateral – in order to gain collateral it is not contractually entitled to: the renewal of a Letter of Credit it had previously allowed to expire through its own carelessness or for some reason GECC now regrets. In effect, GECC is asking this Court for an order that will protect it from the consequences of its own negligence or bad judgment.

GECC fails to mention its true objective in its request for the proposed order. Instead, GECC disingenuously claims it needs "emergency" relief – in the form of the immediate dismantling and delivery of the System – to protect the value of the collateral.

However, this claim is baseless. The purported "emergency" is based on the false allegation that NY MEG is "not capable nor incentivized"[35] to maintain the value of the System.

First, the claim that NY MEG is "not capable" of maintaining the value of the System is baseless. As set forth above, the System is a complex and sensitive piece of equipment that requires specialized maintenance and monitoring by medical professionals and technicians trained in neuroimaging systems and 4-D equipment in particular.[36] In order to maintain its value, the System must be handled by only those who have expertise in the engineering of the System's unique specifications.[37] NY MEG professionals have this expertise and specialized training.[38] Therefore, NY MEG is not only "capable" of maintaining the System, it is in fact only one of a handful of entities in the world with the training and engineering support to necessary to preserve the System and its value. Moreover, NY MEG is in fact currently maintaining the System in good working order.[39] Indeed, the only real threat to the System's value is if it were to be hastily dismantled and turned over to GECC. Such an act would likely result in immediate and irreparable damage to the System's value because it would deprive the System of the very things that support its value: NY MEG's specially trained professionals and engineering support.

Second, GECC's allegation that NY MEG lacks the incentive to maintain the System is equally baseless. The System is integral to NY MEG's continuing business operations. Its maintenance is directly linked to the success of the business, as well NY MEG's ability to provide patient scans to physicians with the appropriate standard of care. The facts of

---

[35] *See* Affidavit of Jon D. Stork in Support of Plaintiff's Order to Show Cause, ¶¶ 67-68.
[36] Hakes Aff., ¶ 20.
[37] Hakes Aff., ¶ 20.
[38] Hakes Aff., ¶ 25.
[39] *See* Hakes Aff., ¶ 24.

-12-

this case bear this out. NY MEG continues to pay technicians to maintain the system and doctors continue to use the System to treat patients.[40] NY MEG's past and ongoing conduct attest to its incentive in maintaining the System. GECC's contrary allegations are false.

            In sum, GECC's "emergency" application is a disingenuous request to gain the collateral – a renewed of a Letter of Credit – that it is not contractually entitle to have.  Indeed, GECC alleges the non-payment occurred back in July.  But at no point in July, August or September did GECC feel the need to declare that the Collateral was in some danger of losing value.  It is only belatedly – now five months after GECC allowed a letter of credit to expire – that GECC suddenly deem the immediate possession of the Collateral, including the System, a "matter of great urgency."  Tellingly, this purported "emergency" has arisen despite the fact there have been no material changes to NY MEG's operation or the use of the System since July.  In fact, NY MEG continues to use the System in treating patients in its ongoing business operations <u>and</u> has continued to make monthly payments to GECC on the loan at issue.  Because the proposed order is not supported by the facts of the case, it should be denied.

## II.    EVEN IF GECC IS ENTITLED TO THE SYSTEM, NY MEG IS NOT CONTRACTUALLY OBLIGATED PHYSICALLY DELIVER IT TO GECC

            GECC demands in its application that this Court issue an order "directing that the System and collateral immediately be delivered Plaintiff, at NY MEG's sole cost."  However, even if GECC is entitled to possession of the System, the Master Agreement does not obligate NY MEG to physically deliver it to GECC.

_____

[40] *See* Hakes Aff., ¶ 26.

GECC set forth in the Master Security Agreement the procedure to be followed by the parties regarding the turnover of the System as collateral to GECC in the event of a default. The relevant portion of the Master Security Agreement provides:

> (a)    The cost of removal and turnover, including all transportation, of the Equipment in the event of Debtor's [NY MEG's] default of a Schedule will be at Debtor's expense. If Debtor makes modifications to the site after the Equipment has been installed which impede the removal of the Equipment, the cost of removing the impediments and restoring the site will be at Debtor's expense.

> (b)    If, following the event of default, Secured Party [GECC] exercises its right to demand that Debtor turn over the Equipment to Secured Party, the Equipment will be turned over to Secured Party or assigns, in the same condition and appearance as when received by Debtor (reasonable war and tear excepted) and in good working order and condition, operable in accordance with the manufacturers then prevailing performance specifications.[41]

The plain and unambiguous language of the Master Security Agreement is clear regarding the parties' obligations in the event of a default. It does not provide for *delivery* of the System. This Court should not read into the Master Security Agreement obligations that are not plainly set forth. If this Court determines that NY MEG's obligations regarding the turnover of the System to GECC are not clear, any perceived ambiguity in the Master Security Agreement must be construed against the drafter, GECC, and in NY MEG's favor. *Levinson v. Primedia Inc.*, 2007 WL 2298406 (S.D.N.Y. 2007)("New York follows the well established *contra proferentem* principle which requires that equivocal contract provisions are generally to be construed against the drafter.") Because there is no basis for GECC's demand that NY MEG physically deliver the System to GECC, this request should be denied.

---

[41] See Tiffany Aff., Ex. A, ¶ 8(b).

**III.    THE EXPIRATION OF THE LC PRIOR TO AUGUST 31, 2007 DID NOT CONSTITUTE A BREACH THE MASTER SECURITY AGREEMENT AND NY MEG DID NOT COMMIT FRAUD IN RELATION TO THE LC**

GECC claims that NY MEG, by issuing a LC that expired on July 31, 2007, breached the Master Security Agreement.  GECC did not object to the July 31, 2007 expiration date of the LC until after it expired.  GECC cannot now claim that the LC's expiration on July 31, 2007 is a breach of the Master Security Agreement because GECC never afforded NY MEG a right to cure that alleged deficiency and GECC also waived any such claims by virtue of its silence.  GECC also claims NY MEG committed fraud in connection with the LC by promising an August 2006 expiration date but "secretly" issuing an LC that expired on July 31, 2007.  Such a claim is ridiculous because GECC was informed of, and made no objection to, the July 31, 2007 expiration date on or about the day it was set in October, 2006.[42]  GECC's fraud claim is therefore baseless.

*GECC Cannot Claim Breach Of The Master Security Agreement Based On The LC's July 31, 2007 Expiration Date*

GECC claims in its Complaint that NY MEG breached the Master Security Agreement because the LC expired prior August 31, 2007.  *See Complaint,* ¶. 74.  The LC expired on July 31, 2007.

In a Second Amendment to the Master Security Agreement, dated August 25, 2006, the parties agreed to modify Section 8(a) of the  Master Security Agreement [43] entitled "Default and Remedies."  The modified Section 8(a) of the Master Security Agreement provides, in relevant part, that the GECC may declare this Agreement in default if:

_____

[42] *See* Hakes Aff., ¶ 11; Tiffany Aff., Ex. E.
[43] The Second Amendment to the Master Security Agreement actually states that Section 8(a), and not 9(a) is being modified but this is a typographical error made by GECC as the Second Amendment to the Master Security Agreement intends to modify, by its own terms, the "Default and Remedies" portion of the Master Security Agreement which is Section 9(a) not 8(a).

(xi) the letter of credit in the amount of nine hundred fifty thousand dollars ($950,000) issued for the account of Debtor to and in favor of the Secured party expires, is terminated or is unenforceable for any reason, (except that Debtor shall be permitted to replace such letter of credit with a replacement letter of credit in the same amount, having an expiration date no earlier than August 31, 2007, issued by a financial institution satisfactory to Secured Party, and otherwise in form and substance satisfactory to Secured Party.[44]

The LC was posted on October 30, 2006.  GECC was given a copy of the LC at that time or soon thereafter.[45]  GECC knew, or should of known, from at least Autumn 2006 that the LC expired on July 31, 2007.  The expiration date of the LC was plain on the face of the document.  Even if GECC didn't read the LC knowledge of its terms is imputed to GECC by law.  *Allen v Meyer*,  73 NY 1 (1878)( the failure of a signer in a commercial transaction to read a form amounts to gross negligence and the signer's entity will be conclusively bound by the security agreement.)  GECC knew when the LC terminated.   GECC did not object to the July 31, 2007 termination date until after the LC expired. GECC thereby prevented NY MEG from curing this alleged breach of the Master Security Agreement.

Under the Master Security Agreement GECC had a duty to notify NY MEG in writing and give NY MEG 30 days to cure any alleged breach of the Master Security Agreement.[46]  GECC failed to object to the expiration date of the LC until after it expired thereby preventing NY MEG from curing this alleged default.  GECC is thus barred from asserting that NY MEG breached the Master Security Agreement on those grounds. *See Clark Oil Trading Co. v. Amerada Hess Trading Co., A Div. of Amerada Hess Corp.*, 1993 WL 300039

_____

[44] *See* Tiffany Aff., Ex. A, Second Amendment.
[45] *See* Hakes Aff., ¶ 11; Tiffany Aff., Ex. E.
[46] *See* Tiffany Aff., Ex. A, Section 9(a)(iii)("Secured Party may declare this Agreement in default if….(iii) Debtor breaches any of its other obligations and fails to cure that breach within 30 days after written notice from Secured Party.")

(S.D.N.Y.,1993)(dismissing a breach of contract claim where plaintiff deprived defendant of its right to cure that very alleged breach of the contract.)

      Additionally, GECC's failure to object to the expiration date of the LC constituted an implied waiver of its right to assert a breach of the Master Security Agreement on those grounds. GECC knowingly accepted the posting of an LC with a expiration date of July 31, 2007 and never objected to it until after it expired. GECC had an obligation to speak on this issue; it was contractually obliged to inform NY MEG of any objection to the LC's expiration date. However, GECC was silent. GECC's silence constituted an implied waiver of any claim that NY MEG breached the requirements of the Second Amendment to the Master Security Agreement by posting the LC with an expiration date of July 31, 2007. *See Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188 (3rd Cir. 1987)("Although silence alone will not constitute a waiver unless there is an obligation to speak [internal citation omitted] waiver may be inferred from silence or acquiescence as from other conduct or inaction.")(quoting *Midwest Maintenance & Constr. Co. v. Vela,* 621 F.2d 1046, 1048 (10th Cir. 1980) and *Minnesota Min. & Mfg. Co. v. Kirkevold*, 87 F.R.D. 324, 335 (D. Minn. 1980); *See also General Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.,* 85 N.Y.2d 232, 236, 623 N.Y.S.2d 821, 647 N.E.2d 1329 (N.Y. Sup. Ct. 1995) (citing *Hadden v. Consolidated Edison Co.,* 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978))("Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right.").

      GECC's failure to object to the LC's termination date until after it terminated prevents GECC from now asserting the July 31, 2007 termination date as grounds for breach of the Master Security Agreement. GECC's silence was also an implied waiver of any such claim. NY MEG did not breach the Master Security Agreement by posting an LC that expired on July 31, 2007.

*There Was No Fraud*

GECC claims that certain alleged representations by NY MEG, all extrinsic to the Master Security Agreement and the LC, constituted fraud and misrepresentation. *See Complaint*, ¶¶ 113 through 121.

GECC claims that NY MEG "repeatedly assured and promised" GECC that NY MEG had posted an LC with an expiration date of August 31, 2007 but that NY MEG "secretly" posted an LC that expired on July 31, 2007. *See Complaint*, ¶¶ 116. GECC asserts that it relied on those alleged representations to its detriment. There was no "secret." The LC plainly set forth that it expired on July 31, 2007. Posting a letter of credit with an clear and unambiguous expiration date is not fraud.

A principal element of GECC's fraud claim is that it "reasonably relied to its detriment on NY MEG's representations regarding the duration of the Letter of Credit." *See Century Pacific, Inc. v. Hilton Hotels Corp.*, 2007 WL 3036172 (S.D.N.Y., 2007); *See Complaint*, ¶ 121. However, the LC plainly set forth that it expired on July 31, 2007 therefore GECC could not have reasonably relied on the earlier date. Even if NY MEG had made any such representations, GECC could not have reasonably relied on them because they are extrinsic communications that contravene the plain language of an unambiguous contract. *See Auto Style Leasing Ltd. v. Evans*, 1995 WL 144812 (S.D.N.Y. 1995)(holding that plaintiff could not assert fraud in a car lease because he couldn't reasonably rely on representations that contravened the plain language of the lease, "Since the written instrument contains terms different from those allegedly orally represented, and [defendant] is presumed to have read the writing, he may not claim he relied on the representations.")(quoting *Iannarelli v. Carvel Stores of N.Y., Inc.,* 18 Misc.2d 930, 187 N.Y.S.2d 628, 632 (N.Y. Sup. Ct. 1959)).

The LC was clear and GECC was on notice as to when it expired.   Any alleged representations made by NY MEG that were extrinsic to and/or contravene the terms of the LC or the Master Security Agreement cannot be reasonably relied on.   Any choice made by GECC to forbear from any of its contractual rights was a business risk.   There was no fraud.

## IV.   GECC CANNOT RECOVER ITS ATTORNEYS FEES AND COSTS

GECC seeks its attorney's fees and costs in pursuing this action.   Under the *American Rule*, each litigant bears its own attorneys' fees.   *Hallinan v. Republic Bank & Trust Co.*, 2007 WL 2572092  (S.D.N.Y., 2007)  The Rule is long standing, deeply rooted, and not lightly disregarded.  *See Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796); *Alyeska Pipeline Service Co. v. Wilderness Society;* 421 U.S. 240, 258-259, 95 S.Ct. 1612, 1622-1623, 44 L.Ed.2d 141 (1975); *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health*, 121 S.Ct. 1835, 1838 (2001).  This Court should follow the *American Rule*.   GECC is not entitled to the payment of its legal fees and costs by NY MEG.

## CONCLUSION

For the reasons set forth above, and the accompanying Hakes Affidavit, defendant New York MEG, L.L.C., respectfully requests that the Court deny GECC's application.

Dated: New York, New York
      December 4, 2008

LEADER & BERKON LLP

By: _____
    GLEN SILVERSTEIN (GS 9174)
    S. ALYSSA YOUNG (SY 6105)
    MICHAEL J. TIFFANY (MT 9367)
    630 Third Avenue, 17th Floor
    New York, NY 10017
    (212) 486-2400
    (212) 486-3099 (Fax)
    *Attorneys for Defendant New York MEG, L.L.C.*