UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————X

GENERAL ELECTRIC CAPITAL
CORPORATION,                                    Case No. 07 CIV 9715 (RJH)

                            Plaintiff,

                                               **AFFIDAVIT OF JOHN HAKES**
          -against-                            **IN SUPPORT OF DEFENDANT**
                                               **NEW YORK MEG, L.L.C.'S**
NEW YORK MEG, L.L.C., 4-D                       **RESPONSE TO THE ORDER**
NEUROIMAGING, INC. and MARTIN EGLI,            **TO SHOW CAUSE**

                            Defendants.

————————————————————————————X


STATE OF NEW YORK      )
                       )      ss.:
COUNTY OF NEW YORK     )

          JOHN M. HAKES, being duly sworn, deposes and says to the best of my

knowledge, information and belief:

          1.  I am the General Counsel and Vice President of New York MEG

Acquisition Company, an Indiana corporation and sole member of New York MEG, L.L.C.

("NY MEG").  I make this affidavit in support of NY MEG's R esponse to General Electric

Capital Corporation' s ("GECC") Order to Sho w Cause, filed October 12, 2007.

          2.  NY MEG is a company specializing in magnetoencephalography (commonly

referred to as MEG).  MEG equipment assists doctors in localizing a pathology and

determining the function of various parts of the brain.

          3.  I have 12 years experience in the medical equipment operations and

financing field.  My experience includes the deployment, operations and financing of MEG

equipment, and MEG equipment manufactured by 4-D Neuroimaging, Inc. ("4-D"), a

defendant herein, in particular.

**Procedural Overview**

4. On October 12, 2007, GECC, as a secured lender to NY MEG, filed an

Order to Show Cause in New York State Supreme Court seeking, as "a matter of great

urgency", the immediate possession of NY MEG's MEG equipment. Th e case was then

removed to the United States District Court for the Southern District of New York on

November 2, 2007. 5. In an effort to negotiate a resolution to the dispute, the parties stipulated to a

45-day standstill for all Court proceedings on November 7, 2007; if no resolution could be

reached, Defendants' response papers were to be served by January 4, 2008. The stipulation

was "So Ordered" by th e Court on November 16, 2007. The parties have not been able to

resolve the dispute since the stipulation.

**Factual Overview**

6. The MEG equipment at issue is a highly complex Neuro Imaging Brain

Mapping System (the " System") manufactured by 4-D that was purchased by NY MEG in

2003 with financing from GECC pursuant to a Master Security Agreement. The System

served as collateral for GECC's loan to NY M EG. A Letter of Credit was also issued in

favor of GECC as additional collateral (the "LC"). The Master Security Agreement was

amended to include, among other terms, a Balloon Payment due on July 25, 2007. The LC

was also amended several times, including its renewal in favor of GECC with a July 31, 2007

expiration.

7.  Through the summer of 2007, the parties discussed reworking the Master Security Agreement.  In July 2007, based, in part, on the continued dialog with GECC regarding the reworking Master Security Agreement, NY MEG did not make the July 25, 2007 Balloon Payment.  As discussions continued, GECC allowed the LC to expire according to its terms without drawing down on it.

8.  Subsequently, the parties' discussio ns broke down and GECC brought this action seeking an order granting GECC immediate delivery of the System.  GECC alleges that the immediate delivery of the System is needed because NY MEG is incapable of maintaining the System's value.   But, in fact, the opposite is true: NY MEG is uniquely qualified to maintain the System's v alue.  The only threat to its value is if NY MEG is forced to dismantle the System for delivery to GECC.  Accordingly, the order should be denied.

## Agreements between NY MEG and GECC

9.  On or about May 9, 2003, NY MEG entered into a Master Security Agreement with GECC whereby GECC agreed to finance NY MEG's purchase of the  System manufactured by 4-D.  Pursuant to the Master Security Agreement, the System would serve as security for GECC's loan to NY MEG.   The Master Security Agreement was amended to include, among other terms, a Balloon Payment due on July 25, 2007.  NY MEG also executed and delivered to GECC a Promissory Note for $775,000 which was amended on October 27, 2005 and August 25, 2006.

10.  NY MEG entered into a separate security agreement with GECC on or about May 14, 2003 which grants GECC a security interest certain additional collateral.

11. Additionally, pursuant to a Second Amendment to the Master Security Agreement, a Letter of Credit ("LC") was issued in GECC's favor in the amount of $950,000. A replacement LC was issued on June 13, 2006. It was renewed on October 30, 2006, also for $950,000 and plainly stated, on its face, that it would expire on July 31, 2007 – "The validit y date is extended until July 31, 2007. This new date is the final maturity. That means not further renewal of the stand-by letter of credit will be made after that date." GECC was forwarded a copy of the LC on or about October 30, 2006. Yet, GECC did not object to the July 31, 2007 expiration date in any way prior to its expiration.

12. Meanwhile, starting in 2003, both parties began to perform under the Master Security Agreement. GECC provided the financing and, as discussed above, GECC was issued the LC. NY MEG did in fact purchase the System and operate it. NY MEG also paid the Installment Payments as they became due.

13. In late 2005 and into 2006, GECC and NY MEG once again began negotiations regarding financing. This resulted in GECC and NY MEG agreeing to additional financing in return for NY MEG's issuance of p romissory notes in GECC's favor in October, 2005 and August, 2006. Additionally, in 2006, GECC and NY MEG began renegotiating the Master Security Agreement – including the deferral of the Balloon Payment.

14. GECC and NY MEG's business relation ship continued into the summer of 2007. NY MEG continued to make the Installment Payments and the parties continued discussions on reworking the Master Security Agreement.

15. In July, 2007, based, in part, on the continued dialog with GECC regarding reworking the Master Security Agreement, NY MEG did not make the July 25, 2007 Balloon Payment. Because of the course of conduct between the parties, where they had already amended the terms of the Installment Payments and the Balloon Payment two times, NY MEG believed in good faith that a third amendment to those terms, including the Balloon Payment, could be reached between the parties.

16. After NY MEG did not make the Balloon Payment, GECC did not attempt to force immediate repossession of the collateral. Indeed, GECC allowed the LC to expire on July 31, 2007 without requesting possession of any collateral, including the System.

17. After the LC expired, GECC demanded that NY MEG cause the issuance of a new letter of credit, despite the fact that NY MEG was not contractually obligated to do so. GECC made the demand for the new LC because it allowed, either for its own reasons or through its own carelessness, the LC to expire. While NY MEG did continue to make monthly payments, it did not issue a new letter of credit.  .

**The System**

18. The collateral at issue, the System, is a complex and sensitive Neuro Imaging Brain Mapping System that uses super-conducting detectors and amplifiers to allow for measurements of the magnetic fields generated by neuronal activity of the brain. It is an advancement in technology made up of several highly sophisticated parts (sensors, magnetometers, computers, complex electrical equipment and precision circuitry).

19. The value of the System derives not so much from the value of each of its components, but rather from the engineering and computer software that integrates each of the complex parts into a working system that can measure magnetic fields generated by the brain and relay those measurements back in a usable format to technicians and physicians.

20. Due to its complexity, the System requires specialized maintenance and monitoring by medical professionals and technicians that are expertly trained in neuroimaging equipment, and this System in particular, in order to maintain its value. Indeed, the value of the System as collateral is contingent upon continued expert handling and engineering support that NY MEG, with support from the manufacturer, has, does and can provide. In order to maintain its value, the System must be handled by only those who have expertise in the engineering of the System's unique specifications.

## The Proposed Order would Destroy the System's Value

21. The proposed order GECC seeks would require NY MEG personnel to dismantle and deliver the System to GECC, deprive the System of necessary maintenance, and result in the destruction of its underlying value. In particular, it is my understanding that if the System was forced to be disassembled by NY MEG personnel and removed from its current location (which itself is especially designed to house the System) its underlying value would be substantially destroyed because once the System's various parts are disintegrated (as it must be for shipment), reintegration involves engineering costs that make reassembly economically impracticable. The reason for this is that the System's equipment is so sensitive it can not be dismantled, stored and reassembled without losing significant value. In fact, it is my

-7-

understanding that the equipment will most likely be permanently unusable if it is not maintained, as it currently is, by professionals with significant training and support by engineers at 4-D.

22. Further, it is my understanding that if the System is removed, there would be no resale market in which to resell it because the costs associated with reintegration of its parts makes resale not economically feasible. Any potential resale purchaser would have to pay for engineers trained by 4-D to reassemble the System, customize its parts to fit with the new customers computers and build special housing for the System so as to keep out naturally occurring magnetic fields. Additionally, a resale purchaser would also have to enter into separate contracts with defendant 4-D to provide ongoing engineering support and pay for professionals to be trained in maintaining the System. As a result of these required steps, the costs a resale purchaser would have to incur in reintegrating and re-engineering the System to make it usable would far outweigh any benefit it could reasonably expect to have over purchasing a new machine. Therefore, once the System is removed from NY MEG's specially designed location, it ceases to have independent resale value as imaging equipment.

23. Further, other than for scrap, it is my understanding that its component parts are virtually valueless as individual pieces of equipment. Dismantling and shipping the System to GECC would irreparably damage the System's sensitive components so as the render what is currently a multi-million dollar piece of equipment, practically valueless.

**NY MEG Preserves the System's Value**

24. If the System remains in the possession of NY MEG, the System will maintain its monetary value. Indeed, the System has been, is and will continue to be maintained by NY MEG in its ongoing business.

25. NY MEG, with the cooperation of the manufacturer 4-D, has the expertise in the maintenance of the System's unique speci fications. NY MEG professionals have been given specialized training by 4-D, the manufacturer of the System, in the maintenance of its integrated components. Therefore, NY MEG is not only "capable" of m aintaining the System, it is in fact only one of a handful of entities in the world with the training and engineering support necessary to preserve the System and its value. Conversely, it is my understanding that GECC has none of this training and support.

26. Further, NY MEG is incentivized to maintain the System because the System is integral to NY MEG's continuing bus iness operations. Its maintenance is directly linked to the success of the business, as well NY MEG's ability to serv ice patients with the appropriate standard of care. NY MEG continues to pay technicians to maintain the system. Physicians continue to use it to treat patients.

27. Therefore, GECC's argument that the System is in danger of losing value is baseless. Tellingly, at no point in July, August or September did GECC tell NY MEG that the System was in some danger of losing value. There have been no material changes to NY MEG's operation or the use of the System since July. NY MEG continues to use the System in its ongoing business operations.

-9-

28. For the reasons set forth above, and in the accompanying Memorandum of

Law, GECC's request f or an order should be denied.

John M. Hakes

Sworn to before me on this
4th day of January, 2008

Notary Public